We'll move now to case number two. Case number 18-1321 Johnson v. Rimmer. First we'll hear from Mr. Lange. Good morning, your honor. May it please the court. I'm attorney Robert Barnes. I'm in substitution of Mr. Lange this morning. Thank you, Mr. Barnes. Yes, your honor. On behalf of Mr. Johnson. Our mental health facilities, our state mental health facilities, and our involuntary institutionalization laws are designed primarily for one purpose. To protect the mentally ill from self-harm. So much so that the Supreme Court in Youngberg decided at 457 U.S. 307 decided that there is an obligation, a due process right of a person in custody in a mental health facility to reasonable safety. In this case, imagine a situation where someone was involuntarily institutionalized because they attempted to kill themselves with razor blades in a warm bath. Or they tried to hang themselves. And for that reason, they're involuntarily institutionalized. And then while in custody, they managed to do that precise self-harm.  That could never be a violation of the due process rights. That is precisely what occurred here. Here you have Mr. Johnson. Who had been institutionalized four times over eight months. He'd just been institutionalized ten days before. He had a repeated history of attempted self-harm. Here he's involuntarily institutionalized because of his attempt to cut off his genitalia. He tells the doctor repeatedly he intends to finish the job. The doctor, in his own notes, in his own testimony, Dr. Masherty says that he considered it a very high risk that Mr. Johnson would do it. A high risk that he would do it. A substantial risk that he would do it. This corresponds to the case law as to what defines a violation of substantive due process. The premise of your argument here is involuntary admission. If we determine that Johnson voluntarily admitted himself to the mental health complex on March 13th, do you lose? I don't believe so, Your Honor, because I believe he still would not be free to leave. The general rule has been that if a person is not free to leave, if they're in custody, even if what brought them there was voluntary institutionalization, if they do not feel free to leave at the time, then they would not be in a position to do that. You're also arguing, aren't you not, that the state actually created a situation that increased, enhanced the danger. That is precisely correct, Your Honor. Around that issue, the question of voluntary or involuntary commitment to the institution really isn't relevant, is it? That is precisely correct, Your Honor. I hope that you will spend some time to talk about that latter theory. Absolutely, Your Honor. For example, in Collinion at 163 F3rd 982, this court noted that if somebody left somebody off for bail out in the wilderness, that that could constitute a deprivation of their due process rights because it was creating a danger that otherwise wouldn't have existed. Here you have someone who has said specifically what his risk is, that he wants to cut off his genitalia. He is then put in isolation with no observation, and the means and tool of what he did, the scissors, left in the bathroom there. Let's break that down a bit because obviously for a lengthy period of time during the involuntary commitment, there was the one-to-one observation. That's absolutely correct, Your Honor. Then he transfers to the 15-minute observation, and around that juncture is when this occurs. There are shifting explanations or different explanations as to how the scissors gets in the room. How is that discussion not a negligence discussion? Yes, Your Honor, here's how. In this particular case where the nurse, subject to the professional standard of care, knows that this particular person wants to cause a particular harm, and they had specific rules that she acknowledged that he should have no sharps anywhere near him, that under one-on-one observation, they had noticed he had a sharp and had it removed from him. She acknowledged that the degree of irresponsibility, there would be a substantial departure from professional care, and that's the requirement of the law. It doesn't require criminal intent. It just requires a substantial departure. In fact, the law that's used is, is there subjective knowledge of a serious need of a substantial or excessive or high risk? Those were the doctors' and nurses' own terms to describe the situation here. In that circumstance, leaving scissors in his... Having scissors anywhere in the bathroom was itself something no minimally competent nursing professional would do under these circumstances. That was precisely why the rules were clear. The scissors had to be in a secure place. He couldn't be even bandaged in the bathroom, which admittedly is what took place here. Scissors could only be used in a careful way, and shouldn't even be used in his instance, and yet that's what happened. So in this case, a minimally competent person would not do so. It would be equivalent to a person leaving razor blades in the bathroom with a warm bath waiting for someone who just tried to commit suicide by that same method, or somebody leaving a rope in their room, in the hanging instrument, for someone who had just attempted to hang himself. And we do have cases that say that you can't do that. That is a constitutional violation, to expose somebody to suicide. That's precisely correct, Your Honor. Well, let me take you one more step, if I could, right now. There was a directive that said you don't change bandages in a bathroom, and that you don't bring scissors in to that room. The directive also says you make the changes in the locked room down the hall, and then you put the scissor in a locked box. Now that was the directive. Is there any evidence that as a matter of course, that there was any practice among the nurses on the floor not to observe that directive, and to in fact change bandages in the hospital bathroom? Yes, Your Honor. That was the testimony of Mr. Johnson. And there was other evidence in the record to support it as well, which was that he was being routinely bandaged in his private bathroom, that they were repeatedly using scissors, and that he was not being taken elsewhere for that process. So we have here a situation where, depending on whose testimony is believed, a nurse on the staff, following a custom or practice on the floor, violated a safety regulation that said you don't even bring the scissor in until you do this whole procedure someplace else in the hospital. Bringing the scissor in, changing the bandage in the room, and then leaving the scissors there. Am I correct? Yes, Your Honor. Why isn't that simply a case of the state creating, in a willful and wanton way, a danger? I know of no example that wouldn't be more an example of a state creating a danger. Because here, the person's brought in for that, to prevent that precise harm, and yet they create the precise opportunity. It's almost an invitation. You have someone who keeps saying, I want to do this. How do you distinguish that from the situation of creating the circumstances you just gave us of the razor blade and the warm bath? I think it's precisely the same. So I think in both cases, or a rope with a hanging equipment for somebody who's trying to hang themselves, it's the precise example of creating a state danger. If just leaving somebody in the wilderness after bail constitutes creating a state danger, which is what this Court said in Cohen, then clearly, putting the instrument to cause them the harm for which they've been involuntarily institutionalized previously, is creating a state danger. So even if it's the case... It's more than that. He said he wanted to finish the job. That's precisely right. He was looking for an opportunity. Absolutely, Your Honor. In fact, according to the doctor's own testimony, he had said it at least six times, and probably eight times, such that the doctor concluded he had a very high risk, substantial risk... Six or eight times what? I'm sorry. That he was going to finish the job. I see. That he was going to, because of the auditory hallucinations. Here's some of the things he did. I want to say, if I could, just to interrupt a minute. Yes, Your Honor. The scenario that you suggested is about changing and doing this and that in the bathroom with the scissors, etc. Was that done only during the, what I'll call the constant observation time? No, it was also while he was not being constipated. How do you know that? That's the testimony of Mr. Johnson as to what happened the very day that he did this. That's Johnson's testimony then? Yes, Your Honor. And he said about three different ways maybe the scissors could have been available. Our view is that at least a reasonable inference, but I would say the most reasonable inference, but at least a reasonable inference is when the only person who had access to the room who changed his bandages in the bathroom, who had a custom and habit of doing so in the bathroom with scissors, was the last person seen before the scissors are found and he uses them. This is the nurse? This is Nurse George, Your Honor. That that most reasonable inference, or at least a reasonable inference, the jury can conclude, is that Nurse George left the scissors there. Mr. Lang, does that directive cover just the one-on-one observation period or the general practice on the floor? General practice altogether. For the precise reason that their main reason for existence is don't allow this self-harm to occur. So these are the minimally competent standards that they've codified at the safety rules. That you have to do it separately. You can't do it there. You have to do, you can't use scissors, or if you do, you have to do it in a secure place where you see it goes back and forth so that there's no risk of a person getting his hands on it. Where here, it was an invitation. Here you have someone who keeps saying, I want to do this. It's the reason he's institutionalized and he keeps going into his bathroom that day and there's scissors sitting there. I mean, I can't imagine a more horrifying circumstance. And if, as a matter of law, that could never be a violation of substantive due process, then we have such a substandard system of mental health care as to make it a mockery to the world. That's never been the law. That's not been the law of this circuit. That's not been the law of the Supreme Court. And there the district court  and that's where it made its error. I'll reserve the bulk of my time for rebuttal, Your Honor. You may do so. Thank you. Next we'll hear from Mr. Cranley. Good morning. May it please the Court. Good morning. The plaintiff cannot state a claim for violation of his substantive due process rights because he was not held against his will and because he was a voluntarily admitted patient. The plaintiff has given us no reason to depart from that well-established precedent. But even if he could, the evidence presented at summary judgment and in this record was insufficient to meet the standard required to sustain that claim. That standard required the plaintiff to come forward with evidence that the care and treatment provided by Dr. Macri and Nurse George, the only two individual defendants and the only defendants remaining in this case on appeal, treated Mr. Johnson with such a substantial, their treatment was such a substantial departure from accepted professional judgment practice or standards as to demonstrate that they did not actually base their decisions on any professional judgment. That is that no minimally competent professional would have reached the same decision that Dr. Macri did and Nurse George did in this case. Now it's undisputed that the plaintiff suffered from some significant mental illness. It's also undisputed that by the time he was removed from one-to-one observation, the direct observation you revert to, and by the time that he, the scissors were found in his room, he had improved significantly. And after more than a week of treatment and medication, Dr. Macri, a doctor of psychology who had seen the plaintiff each and every day he was in the behavioral health center, decided in his professional judgment that it was reasonable and safe to remove him from one-to-one observation. Now the Supreme Court has stated in Youngberg that this decision, if made by a professional, is presumptively valid. The fact that, with the benefit of hindsight, the plaintiff or his lawyer or his hired expert believes that that was an inappropriate decision, well that might be basis for a claim of medical malpractice. But of course the Constitution does not protect patients from medical malpractice and that does not meet the standard under the 14th Amendment. The plaintiff has to meet the same high standard under the professional judgment rule with regard to his claim against Nurse George, which is where the claim is with respect to these scissors. It's against her individually. She's a registered nurse. She'd worked at the behavioral health center for 10 years at the time of the Saxon. Now to find her individually liable under Section 1983, the plaintiff has to prove her personal involvement in the alleged constitutional deprivation. That is, must establish a causal connection, an affirmative link, between the misconduct alleged and her conduct. The evidence presented in summary judgment doesn't support that conclusion as Judge Adelman properly found. As you mentioned, Mr. Johnson gave numerous conflicting versions of how he came to possess the scissors. But even if we accept the version that they were left in the, found under some towels in the bathroom, he testified under oath that he has no idea how they got there. He doesn't know how long they were there, could have been there the day before or longer. He doesn't know who left them there. And he doesn't remember Nurse George changing his dressings that day in his room or elsewhere, and therefore he doesn't remember her having scissors. He certainly doesn't remember being personally responsible for leaving them in the bathroom. And perhaps more importantly, prior to this appeal, the plaintiff never identified Nurse George as the individual who caused his constitutional violation. In the complaint, the plaintiff made only general allegations that all the defendants were responsible. At summary judgment, the plaintiff made a claim that it could have been any one of at least three people who could have left the scissors there. Only on appeal has the plaintiff created or come up with new factual arguments to support his claim. Those claims are waived under the very case that counsel cited in the previous argument, that Allen case, that says you can't present new factual arguments to support your claim on appeal. What would be the test in this? Would it have to be to have left the scissors there? Would it have to be intentional? Would it be a reckless disregard? Would it be accidental or what? Because this is, obviously he got a hold of scissors somewhere. They had specific consultation among the professionals about what his capacity was. They thought he'd improved and some medication had helped, etc. So I don't know whether they were acknowledging a risk of letting him be 15 minutes by himself or whether they thought he had graduated to that condition. Because I don't think there's any way anybody would want to say that somebody did this on purpose or was just negligent. And that has not, it's not been suggested that it was done on purpose. Now clearly Dr. Macri in his professional judgment thought it was safe to go from one-to-one observation down to every 15-minute observation. It was based on what? Consultation with others? Didn't they have a meeting with everybody? Apparently the actual MD or whatever was not there at that time. Is that correct? He was not there on the weekend of the 17th or the 18th when it occurred. But he had been there every day prior to that and prior to him removing him from one-to-one observation. So let me talk first about the one-to-one issue and then talk about the standard for Nurse Brown leaving it in the room. So what plaintiff has done here is kind of picked and chosen some facts from the record and said the facts show that he was continually saying he was going to harm himself with a pair of scissors or whatever. The fact of the matter is he'd been in the behavioral health center for 10 days. His condition had improved substantially. He'd gone for more than 48 hours without indicating he had any intention to harm himself. He expressly said he had no intention anymore to harm himself, commit suicide, etc. He was cooperating with his treatment. He was otherwise showing a positive outlook. His condition was improving and as a matter of professional judgment it was appropriate, though with the benefit of the hindsight maybe not a good idea, to remove him from one-to-one observation. Now with regard to Nurse George, the plaintiff, under the professional judgment standard, has to show that she was aware of a significant risk to his health, a significant medical need, and that she consciously disregarded that. It's akin to a deliberate indifference approaching intentional conduct. It has to be conduct which shocks the conscience. And in this case, first of all, the plaintiff has already waived the argument that Nurse George is individually responsible. Second of all, he can't identify her as the individual who did it. And third of all, her conduct certainly does not rise to that level. She hasn't treated the plaintiff during his initial 10 days and 14 days now since he actually attempted to cut his genitalia off. She comes in on the weekend. She has access, readily access, to the last three days of records. She perhaps never even knew that scissors were the actual implement of his choice. By the way, she has denied that she changed his bandages in the room or that she even used scissors. But in any event, um... She's a part-time person, I guess? Correct. So, she has limited knowledge of his full history but certainly knows he had in the past a penchant for hurting himself. But at the time she's there, he's already been removed for a couple of days from one-to-one observation. So he's on general observation like the rest of the floor. He's specifically saying that he has no intention to harm himself, to kill himself, etc. He's displaying, according to the records and her notes in particular, no harmful or uncooperative  and so on and so forth. He's cooperating with treatment, he's mingling with other patients on the unit and so on. So, does the plaintiff have to prove that she intentionally left the scissors there? No. But it has to be conduct approaching that. I mean, certainly there's no evidence even that she was aware that there was a sharp object, scissors or whatever in his room and said, you know what, the nurse on the next shift will get that. That sounds to me like conscious disregard. There's no evidence that this was anything other than inadvertence, whether it was her or the nurse on the shift the night before or the housekeeper who overlooked the scissors if they in fact were there under a towel in the bathroom. There is no indication that this is anything other than inadvertent behavior, negligence perhaps. The focus that the plaintiff tries to bring to the horrific nature of the injury is not what we're talking about here. What we're talking about is does her conduct, is it such that it shocks the conscience? That is the standard that's required to satisfy a claim under section 1983. The court explained in County of Sacramento versus Lewis, the U.S. Supreme Court, that the Constitution does not purport to supplant traditional court law in laying down rules of conduct to regulate liability for injuries that attend living together in society. That's what we're talking about here. Rather, the due process clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression. The degree of culpability must be that which shocks the conscience. Conduct that violates decencies of civilized conduct is so brutal and offensive that does not comport with traditional ideas of fair play and decency, and so on. Nurses are permitted to use scissors on the job. It's an instrument of their job. They are supposed to use them, including for changing dressings, in the treatment room, which is, of course, exactly what Nurse George said that she did. But even if she had made a bad judgment, perhaps figuring that the plaintiff was off one to one, his condition was improving, he wasn't talking about hurting himself, and she chose to do that in his room and then left the scissors there by mistake. That certainly is not behavior that shocks the conscience. This is not like the kind of wild scenarios that the plaintiff has painted of filling the bathtub full of razor blades and hot water. This is a nurse doing her job with the instruments of her job and perhaps inadvertently leaving them there. I also want to point the court's attention to a recent case here in the Seventh Circuit, Colbert v. City of Chicago, which gets to the issue that individual life and liability under Section 1983 requires the personal involvement of the defendant in the alleged deprivation. In that case, the plaintiff asserted a substantive due process claim under the 14th Amendment against a number of officers who had done a search of his home and damaged his property. There he named four out of the ten officers who were involved in the search but said that he couldn't identify which one was involved. And the court said that the plaintiff was unable to satisfy 1983's personal responsibility requirement and summary judgment where he wasn't able to identify which individual actually caused the deprivation. He said there may be other claims against him under a negligence theory or other theory, but in a substantive due process claim under Section 1983, the plaintiff has to prove individual responsibility, this mere circumstantial evidence or assumption that she must be the one who did it is insufficient. And I would note, too, the plaintiff is stuck with the record that they created at summary judgment. And at that time, if you read Judge Adelman's opinion, he says the plaintiff says that it could be any one of three people. And the fact is that he can't say which one. And the judge said that's too speculative to prove individual liability. I want to touch quickly on the substantive due process issue because that's a threshold matter that if the plaintiff doesn't prove that somehow he became, in his voluntary admission, an involuntary admin, that's the end of the game. And the plaintiff has raised three arguments. One is a procedural due process claim that he was somehow entitled to a hearing. That issue was never raised in the pleadings, never raised at summary judgment, never raised in the plaintiff's opening brief, and was mentioned only for the first time on reply. So that's waived. But in any event, there is no authority for the suggestion that a plaintiff who has voluntarily admitted a patient, who's voluntarily admitted, who has that petition withdrawn, and then agrees to become a voluntary admit, is then entitled to a hearing to allow him to voluntarily admit himself for treatment. There's simply no authority to support that. The plaintiff cites him. Secondly, the plaintiff argues that he wasn't competent to agree to a voluntary admission. Again, there's no evidence to support that. The only evidence here is that two doctors of psychology met with the plaintiff, discussed what a voluntary admission was, he agreed to it, signed the form, he testified at deposition, he remembered that conversation, he remembered signing it. No witness, not the plaintiff, not a family member, not a friend, not another medical provider, not even the plaintiff's own hired expert has come in here and testified that the plaintiff was not competent, that he didn't understand what he was doing when he was voluntarily admitted. And he'd been admitted before, voluntarily. He knew what it was about at other times. What the plaintiff has done is simply use counsel's own unqualified supposition or assumption based on the records that because he was mentally ill, he wasn't competent. That is not competent evidence of competence, and it's really irrelevant. Mental illness does not mean incompetence. And finally, the plaintiff claims that because he could have been held as an involuntary or emergency patient had he requested discharge, that he somehow becomes an involuntary patient. That's simply contrary to the law. I mean, there is no law that suggests that if that were the case, then every individual who's voluntarily admitted, all of whom must be advised that they can be and must be discharged at any time unless the treatment director decides that they are dangerous and then submits a statement of emergency detention and follows all the regulations that flow from that, that they can be kept. Plaintiff just says, you know, he was so mentally ill he was never going to be discharged. Well, his expert doesn't say that. Plaintiff's counsel is the only one who's making that argument. Again, that's not competent evidence that he was held against his will, which is required under Descheny for substantive due process claim to even be permitted. Thank you, Mr. Cranley. Thank you very much. Mr. Barnes, rebuttal. Mr. Barnes, I know you have a few things you probably want to cover, but I hope that you will cover whether exactly what evidence there is on the record that points the finger at Nurse George as being the person who left the scissors there. Yes, Your Honor. I believe that's throughout the record, including there's at 73-4, 79-2, 70-11-2, 79-15-23, 78-2, 78-2-4-15, 70-11-6. What are you referring to? I'm sorry. The citations will be DN, Your Honor. So the citations to the record that were at the district court level. Okay. So at the district court level, she was identified, and the question was whether or not there was a reasonable inference that she left the scissors there. They argue that because there was a reasonable inference that someone else could have, that that means there's no reasonable inference the jury could conclude as a matter of law that she did. That's never been the law. Otherwise, we have a situation where all you have to do as a medical professional is simply deny knowledge of how it got there, and nobody can ever be held responsible for the very harm that you are retained and supposed to protect against occurring. In addition here, I would note the reference shock the conscience. The standard as articulated by the Supreme Court and by this Court of Appeals throughout is the professional care standard, not the shock the conscience standard. And what they established suffices is simply subjective knowledge of a serious need and a substantial risk. The doctor's own notes, her nurse's own notes, the nurse's review of the doctor's notes all talk about a serious need of a substantial risk. In fact, that's his exact words, substantial risk. He also uses the words high risk and very high risk of a particular harm that meets the definition of a serious need. As to the issue of involuntary institutionalization, the question is whether as a matter of law no juror could possibly determine that this was anything but a voluntary institutionalization at this time. Here, the issue, and here they make references to claims of waiver. I would note the district court didn't rely on involuntary institutionalization. His explanation was he didn't think it met because he thought it was negligent. So we responded to their argument which was their alternative argument to affirm the district court and so responded accordingly. And that raises issues that here they didn't follow their own rules under procedural due process. He clearly wasn't free to leave or a juror could at least reasonably infer that under the circumstances. Both of which would negate the involuntary institutionalization claim. But critically is the issue of informed consent. We're not arguing that because he's mentally ill a jury could determine he didn't inform consent. We're arguing based on the doctor's own records which said he had quote, impaired judgment, racing manic thoughts, auditory hallucinations, paranoid schizophrenia, constant delusional thoughts, disorganized speech, depressed affect, decreased and diminished ability to even concentrate or complete a sentence, high risk and very high risk of serious self-mutilation and spontaneous self-harm because he was suffering from constant quote, acute psychosis. The doctor's own words. We would note that he didn't substantially improve enough for anything in his drug cocktail to change at all. We know here, like what Youngberg said, which said, this is all really about is there a reason other than medical care, Youngberg at 323, for what they did. We know what that was. They had inadequate staffing on the weekends. That's when he suddenly changed his one-on-one observation. He didn't change a single thing otherwise in the diagnosis. Well, that's what you're saying now, that the inadequate staff on the weekends is why he changed. Well, that's an institutional violation, I suppose, or whatever you're claiming. Yes, Your Honor, because the reason why he removed him from one-on-one observation was solely because he had inadequate staffing, not for any medical reason. That is what a jury could reasonably infer. And almost their argument is a closing argument for jury trial. It's not grounds for summary judgment. So we respectfully request the Court reverse and allow a jury to determine the facts. Thank you, Your Honor. Mr. Barnes, will you submit a letter with those docket references? Yes, Your Honor, I will. Thank you. Thank you, Mr. Barnes. Thank you, Mr. Cranley. The case will be taken under advisement. Thank you, Your Honor.